UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

JEREMIAH GINN,                          )
                                        )
        *Petitioner*,                   )
v.                                      )          No. 4:08-cv-72
                                        )          *Mattice/Carter*
JAMES FORTNER, Warden.                  )
                                        )
        *Respondent*.                   )


# **M E M O R A N D U M**

Jeremiah Ginn ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Court Doc.1). Respondent James Fortner, ("Respondent") Warden of the facility where Petitioner is housed, has filed a Motion for Summary Judgment (Court Doc. 15), and Petitioner has not filed a reply.

In 2002 Ginn was convicted by a jury of second degree murder and sentenced to 24 years imprisonment, to serve 100 percent of his sentence. Ginn now petitions this Court for review of that conviction and sentence. He bases his request for relief on claims that the trial court unlawfully enhanced his sentence in violation of *Blakely v. Washington,* 542 U.S. 296 (2004); that he was interrogated in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966); and that counsel was ineffective for failing to prepare for the sentencing hearing and object to hearsay testimony during that hearing.

After considering the filings of Respondent and Petitioner, the record of the state proceedings and the applicable law, the Court concludes that Petitioner's § 2254 petition (Court Doc. 1) will be **DISMISSED** and Respondent's motion for summary judgment (Court Doc. 15) will be **GRANTED**.

## I. STANDARD OF REVIEW

A state criminal defendant may obtain federal habeas relief if he can demonstrate he is in custody pursuant to the judgment of a state court in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254. Under Rule 8 of the Rules Governing Section 2254 Cases in the United States Districts Courts, the Court is to determine, after a review of the response, the transcript, the record of state court proceedings, and the expanded record, whether an evidentiary hearing is required. If a hearing is not required, the district judge may dispose of the case as justice dictates. The Court finds it unnecessary to hold an evidentiary hearing in the instant case.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court reviews decisions of the state courts pursuant to 28 U.S.C. § 2254(d). This statute limits a federal district court's jurisdiction to review habeas claims on the merits. In particular, a court considering a habeas claim must defer to any decision by a state court concerning that claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1) and (2). *See Williams v. Taylor*, 529 U.S. 362, 411 (2000) (interpreting the language of § 2254).

In reviewing a state court's adjudication of a habeas claim, the federal district court must presume the state court's factual determinations were correct. 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption of correctness by clear and

convincing evidence. *Id.* Likewise, credibility findings made by state courts are entitled to the presumption of correctness. *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004), *judgment vacated by Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005); *Smith v. Jago*, 888 F.2d 399, 407 (6th Cir. 1989), *cert. denied*, 495 U.S. 961 (1990). Although "deference does not imply abandonment or abdication of judicial review," *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003), the "highly deferential standard" required by § 2254(d) mandates that state courts' decisions "be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted).

## II.     SUMMARY JUDGMENT

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  In ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *National Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex Corp.*,

477 U.S. at 322. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; National Satellite Sports, 253 F.3d at 907.

## III.  PROCEDURAL HISTORY

On May 10, 2002, Petitioner was indicted in Warren County, Tennessee for second degree murder. After a jury convicted him on the charge, he was sentenced to 24 years, at 100 percent. Petitioner's motion for new trial was overruled; the Court of Criminal Appeals affirmed his conviction and sentence on March 31, 2005. The Tennessee Supreme Court denied his application for permission to appeal on October 10, 2005. *State v. Ginn*, No. M2003-02330-CCA-R3-CD, 2005 WL 736711 (Tenn.Crim.App. 2005).

Petitioner thereafter filed a *pro se* petition for post-conviction relief on September 13, 2006, and on September 22, 2006, the court appointed counsel and ordered the state to file a response to the petition. An amended post-conviction petition was filed on October 23, 2006, and a hearing was held on October 25, 2006 (Addendum III, Vol. 2). The trial court denied relief on May 4, 2007, and Petitioner filed a timely notice of appeal.

The Tennessee Court of Criminal Appeals affirmed the denial of the post-conviction petition on July 18, 2008. Petitioner did not pursue an application for permission to appeal to the Tennessee Supreme Court. Petitioner filed the instant timely *pro se* habeas petition on September 19, 2008 in the United States District Court for Middle Tennessee. The Middle District transferred the case to this Court since Petitioner is attacking a criminal

-4-

conviction from the Circuit Court of Warren County, in McMinnville, Tennessee, which is in the Eastern District.

## IV.    FACTUAL BACKGROUND

Because Petitioner contends counsel failed to investigate the case and present certain testimony, the Court finds it necessary to present a detailed recounting of the facts as presented to the appellate court on direct review and post-conviction, i.e., identifying the witness and discussing the testimony of each witness.  Therefore, the trial facts are taken from the Tennessee Court of Criminal Appeals' opinion during Petitioner's direct review, and the post-conviction facts are taken from the Tennessee Court of Criminal Appeals' opinion during his state post-conviction proceedings.

### A.    *Trial Facts*

This case relates to the defendant's killing Robert Webb on March 31, 2002. At the trial, Jamie Webb, the victim's wife, testified that on the night of the murder, she arrived home from work to find the victim, the defendant, Allen Smith, Brent Breedlove, and Mr. Breedlove's girlfriend, Tina Ledbetter, sitting around, drinking, listening to music, and talking. She said that after a while, the defendant and Mr. Smith left. She said that later, she heard her husband arguing over the telephone with the defendant's sister. She said that at the conclusion of the telephone call, her husband left to go into town, telling her to go to Brent Breedlove's house where he would meet her later.

On cross-examination, Mrs. Webb acknowledged that when she met the victim, he was living in Reno, Nevada with the defendant and that the two men were best friends. She said that even after she married the victim, the defendant "was sort of part of the household" and like a brother to her and the victim. She said that because the victim had an easier time making money than the defendant, he would give the defendant money on a regular basis and that the defendant would repay the victim. She said she noticed the relationship between the victim and the defendant deteriorating in the year before the victim's death, but she did not know the reason for the deterioration. Mrs. Webb also acknowledged that the victim owned a handgun and a pair of brass knuckles. She said that when the victim left home after talking to the defendant's sister, he was as angry as she had ever seen him but that she did not know of any reason the victim would have had

for wanting to kill the defendant.

Brandy George, the defendant's sister, testified that although she had heard of difficulties between the defendant and the victim, she had never personally witnessed any problems before the events in question. Ms. George testified that on the night of the murder, she arrived home about eleven after having gone out with her boyfriend, Chris Taylor. She said that the defendant arrived home before she went to bed and that she had a brief conversation with him. She said that after she went to bed, she received a telephone call from the victim, who wanted to speak to the defendant. She said she went to the defendant's room to tell him the victim was on the telephone but found him asleep. She said she returned to the telephone and told the victim that the defendant was asleep. She said only a few seconds after having ended the first telephone call, the victim called a second time and told her, "Go wake Jeremiah up right now." She said she went into the defendant's room and told him what the victim had said. She said the defendant told her to tell the victim that he was asleep. She said that when she again told the victim that the defendant was asleep, he retorted, "Tell him that I am going to break his f* * * *g neck." She said the second telephone call was the last one that she received. She said the defendant came to her room later that night to tell her that the victim had called again, telling the defendant that "it was war and that he was coming with a gun." She said that the defendant asked her to call friends for help and that she called her boyfriend.

Ms. George said that shortly after her brother came into her room, the victim arrived and began yelling for the defendant to come out of the house. She said she went outside to confront the victim on her porch. She said she asked the victim, "Is this over meth?" She said he responded, "No ... Your brother owes me $40.00." She said that during this time, the victim was acting like he was going to hit her and that after she told the victim he was disrespecting her grandfather's house, he said, "f* * * your grandpa, f* * * you, Brandy, and f* * * Jeremiah." She said the victim began taunting the defendant by walking up and down the porch and calling the defendant "a p* * * y." She said that while the defendant was taunting the victim, he again acted as if he were going to hit her. She said she then went inside, got forty dollars, returned, and gave the money to the victim. She said that after she gave the money to the victim, he did not leave but continued cursing at the defendant. She said that as she was going back inside, the victim began walking toward his truck. She said that as she returned inside, the defendant opened the door and shouted at the victim, "What is up now?" She said that the victim yelled something back at the defendant but that she could not hear what he said. She said that the victim and the defendant began yelling back and forth at each other, that the victim threw a can of lighter fluid inside the home, and that the defendant reacted by going outside after the victim with

a knife. She said that upon seeing the defendant go after the victim with a knife, she began screaming and ran outside to find the defendant and the victim lying on the ground, struggling for the knife. She said that she tried to break up the fight but that the defendant pushed her out of the way. She said that during the struggle, she witnessed the defendant repeatedly stab the victim. She said that upon seeing the defendant stab the victim, she began screaming again and that she heard someone asking for help. She said she ran inside and told her grandfather that one of the two men "was hurt real bad." She said that she returned outside and went over to the victim and that she thought he was still alive. She said that she then noticed the defendant coming back from the victim's truck with a gun and that he did not have the gun before going to the truck. She said the defendant walked over to her grandfather's trailer and fired the gun into its side. She said that she then told the defendant she thought the victim was still alive and that the defendant replied "he would take care of it." She said the defendant went back to the victim and stabbed him again a couple of times somewhere between his ear and the upper chest area, but she was not sure.

On cross-examination, Ms. George acknowledged that when the victim first arrived, he began beating loudly on her window. She said that while the victim was beating on the window, he was saying to the defendant, "Come on out you f* * * * *g p* * *y. Come on out ." She acknowledged that the victim was screaming constantly and "yelling at the top of his lungs" and that she had never before seen the victim act in such a manner. She said that she thought the victim had been drinking and using methamphetamine.

Warren County Sheriff's Department Investigator Marty McGinnis testified that he was called to the scene on the night in question and assigned to the case as the lead investigator. He said that when he arrived on the scene, the defendant had cleaned his hands, so no blood was apparent on his skin. He said he ordered the defendant transported to his office for an interview. He said that during the interview, the defendant said that he stabbed the victim because he was afraid the victim was going to shoot him. Investigator McGinnis said that the defendant first told him the victim had fired his gun into the trailer but that the defendant's version of events "was just impossible" given the physical evidence. Investigator McGinnis said that he confronted the defendant with the inconsistency between his statement and the physical evidence and that the defendant admitted staging the crime scene to reflect that the victim had fired his gun.

Dr. Thomas Deering, a forensic pathologist and medical examiner, testified that he performed the autopsy on the victim. He said the victim died of "multiple knife stab wounds." He said the autopsy revealed the presence of nineteen wounds, which he concluded were the result of the victim having been stabbed a total of fifteen times. Dr. Deering said that the victim could

have survived some of the stab wounds but that others were fatal. Dr. Deering said that one wound severed the jugular vein and two others severed the cervical spinal cord. He said these wounds were "in and of themselves fatal." He said that still other wounds punctured the victim's right lung and that they were "definitely fatal wounds." Dr. Deering said that in his opinion, two of the fatal wounds were inflicted while the victim was lying on his stomach and that one wound, which he opined was not fatal, was inflicted immediately after or simultaneously to the victim's death. He said, however, that in his opinion, all of the fatal wounds were inflicted while the victim was still alive.

Dr. Deering also testified that during the medical examination he found a pair of brass knuckles in the victim's pants. He said that in his opinion, some of the victim's wounds, which were not inflicted by the knife, were consistent with having been inflicted by brass knuckles. Specifically, he noted that a group of lacerations on the victim's face were consistent with the defendant having worn brass knuckles when striking the victim. He acknowledged, however, that the wounds were also consistent with the victim being struck by a fist devoid of brass knuckles. This concluded the state's proof.[1]

The defense called Brent Breedlove who testified that he was at the victim's house on the night of the murder with his girlfriend, Tina Ledbetter, and that he overheard the victim speaking with the defendant's sister on the telephone. Mr. Breedlove said that the victim told the defendant's sister, "I am going to come and we are going to straighten this out." He said he understood the victim to mean that he was going to "whip Jeremiah." He said that the victim had been involved in a gun battle where the victim and a driver of another car got into an argument at a stop light, resulting in shots being fired by both the victim and the other driver. Mr. Breedlove said he was certain the defendant would have known about the shooting incident because the defendant was a better friend to the victim than he was. He said that when the victim left to go to the defendant's trailer, he had consumed between six and eight cans of Budweiser. Mr. Breedlove said that he wanted to go with the victim to keep the peace but that the victim would not allow him to do so. He said that both the victim and the defendant had been drinking and using methamphetamine earlier that night.

Paul Allen Smith testified that he drove the defendant to the victim's house, that he attended the party with the victim and the defendant, that he left with

---

[1]     We note that in addition to these witnesses, the state also introduced the 9-1-1 tape and a taped conversation the defendant had with Paul Allen Smith and Chris Taylor while he was in jail awaiting trial. However, these exhibits are not included in the record on appeal.

the defendant and drove him home, and that the victim called him sometime after he returned home. He said he did not speak with the victim, the victim spoke to him. He said the victim was upset when he called. He said the victim was shouting at him over the telephone. He said that the victim told him, "I am going to go over [to the defendant's house] and take care of it, and if I have to get a crew, I will come over there and take care of you too." Mr. Smith said he had no idea what the victim was talking about. He said he was surprised by the victim's telephone call because he did not know what it was about and because he did not know the victim very well. Mr. Smith said that shortly after the victim called him, the defendant called. He said the defendant told him, "Robert is on his way. You know he has always got a gun. He is coming out here and it is going down." He said the victim had a reputation for always carrying a gun. He said that when he was at the victim's house, the victim showed him "a Smith and Wesson 350 automatic" pistol. He said that shortly after receiving the call from the defendant, Brandy George called him asking him to come out and help. Mr. Smith said that because of the frequency of the telephone calls, he initially thought they were intended as a joke, and therefore, he did not go to the aid of the defendant.

Chris Taylor testified that he is Brandy George's boyfriend, that they live together, and that she called him on the night in question and told him to come over to her house. He said she told him that the victim was on his way over and that there was going to be trouble. He said that she was upset and crying while he was talking to her. He said that as a result of the telephone call, he went over to her house and that when he arrived, the police were already on the scene.

Harold Bowdoin testified that he is the defendant's grandfather and that he was sleeping at home when the victim came over and started beating on the door. He said that Brandy George was frantic, that he tried to dial 9-1-1 but failed, and that the defendant helped him dial 9-1-1. He said that while the victim was outside making threats, he went to his bedroom to retrieve his shotgun because he thought somebody was breaking in but that he stopped because Brandy said that the victim was leaving. He said that about the time he returned to the area near the front door, a can of lighter fluid came flying into the house.

*State v. Ginn*, 2005 WL 736711, *1 -4  (Tenn.Crim.App.,2005).

### B.    Post-Conviction Facts

The Appellant testified that after he was transported to the county administrative building, he was placed in a room and questioned by officers and subsequently made a statement without being informed of his Miranda rights. According to the Appellant, after he gave this statement, the officers

left and then returned, read him his Miranda rights, and then videotaped a statement identical to the first statement given. Afterwards, he claimed he was placed in a cell by himself for eight to ten hours and was denied the use of a phone, food and water, and a restroom. He stated that he was "delirious and tired" when officers questioned him, after again reading him his rights, and he gave a third statement. The Appellant said that after this statement he was taken to the sheriff's office where officers again began questioning him. At this point, he stated that he informed the officers that he did not want to talk anymore and requested an attorney, at which time all questions ceased. The Appellant also testified that his trial attorneys had failed to call certain witnesses in his defense, both at trial and sentencing, who could have given testimony regarding the victim's propensity for violence. Moreover, according to the Appellant, his trial attorneys failed to properly question certain individuals who did testify regarding the victim's violence and "mob" ties. Finally, the Appellant complains that trial counsel called only his mother at the sentencing hearing and asserted that counsel failed to confer with his mother prior to her testimony.

Paul Allen Smith was called to testify at the post-conviction hearing and stated that, although he testified at trial, he would have testified to the Appellant's good character, if asked. He stated that he would have testified that the Appellant, to his knowledge, had never hurt anyone and that he believed that the Appellant was defending his life when he stabbed the victim. Moreover, Smith stated that he could have testified to personal knowledge regarding the victim's propensity for violence, including the fact that he carried a gun, had made previous threats against the Appellant, and had criminal connections.

The Appellant also called Billy George to testify at the post-conviction hearing. According to George, he had known the Appellant all his life and was not called to testify at trial, although he was available. He stated that had he been called, he would have been able to testify to specific instances where the victim had previously threatened the Appellant, that the victim had bragged about having connections to the mob, and that he believed the victim to be violent. On cross-examination, George did acknowledge that the Appellant was involved in illegal activity with the victim.

Two of the Appellant's three trial attorneys also testified at the hearing. The first stated that he did not recall the Appellant ever mentioning a Miranda violation. He further testified that no motion to suppress was filed because introduction of the Appellant's statement allowed the defense to place before the jury evidence favorable to the Appellant without having him actually testify. Trial counsel stated that the defense team had numerous discussions with the Appellant with regard to the introduction of the victim's criminal activities because it could equally impact the Appellant, as he was also

involved in the activities. According to trial counsel, it was decided that the best possible defense to pursue was one of self-defense based upon the testimony of multiple witnesses regarding threats made against the Appellant by the victim. Lead counsel for the Appellant also testified that he did not recall the Appellant requesting that anyone other than his mother testify at sentencing.

Finally, Investigator McGinnis testified that the Appellant was never questioned without the benefit of his Miranda rights. In contradiction to the Appellant's testimony, McGinnis specifically stated that only three statements, rather than four, were made by the Appellant and that prior to each statement, the Appellant was informed of his rights.

*Ginn v. State,* 2008 W L 2780593, *2 -3 (Tenn.Crim.App.2008).

## V.    ANALYSIS

Petitioner raises three grounds in his habeas petition: (1) his sentence violates *Blakely v. Washington*; (2) his statement was taken in violation of his Fifth and Sixth Amendment rights; and (3) counsel was ineffective.  These claims were adjudicated on direct appeal or on appeal of the denial of his post-conviction petitioner, thus they shall be reviewed pursuant to § 2254(d).

### A.    *Sentence Violates Blakely v. Washington*

Petitioner contends, as he did on direct appeal, that the trial court enhanced his sentenced in violation of *Blakely v. Washington*, 542 U.S. 296 (2004), because he was sentenced to more than 20 years, the presumptive sentence to be imposed unless there are enhancement factors present.  Tenn. Code Ann. § 40-35-112(a)(1).[2]  Petitioner was sentenced to more than the presumptive sentence based on prior convictions and other factual findings made by the trial judge. The state appellate court concluded that although

[2]      Tennessee's sentencing act "provides that procedurally, the trial court is to increase the sentence within the range based on the existence of enhancement factors and, then, reduce the sentence as appropriate for any mitigating factors." *State v. Ginn*, 2005 W L 736711, *10 (Tenn.Crim.App. 2004)

the trial court's enhancement of Petitioner's sentence violated the rule in *Blakely*, the constitutional error was harmless because the evidence clearly supported both sentencing factors—violation of terms of probation on three separate occasions and use of a deadly weapon during the commission of the offense—beyond a reasonable doubt. Petitioner contends the state court finding of harmless error was unreasonable. Since the record demonstrates that the jury would have found those two sentencing factors, the error of not having the jury find those two enhancement factors was harmless beyond a reasonable doubt.

On direct appeal the appellate court concluded that the trial court's enhancement of Petitioner's sentence to 24 years violated the rule announced in *Blakely*, but that the constitutional error was harmless beyond a reasonable doubt. *State v. Ginn*, 2005 WL 736711, at *8. The appellate court found that although Petitioner's prior criminal record did not indicate he had a prior felony conviction, it did reflect a lengthy history of criminal convictions; the evidence demonstrated Petitioner violated the conditions of probation three times; and the evidence presented to the jury, including the testimony of the medical examiner, unquestionably demonstrated Petitioner killed the victim with a knife, thus using a deadly weapon during the commission of the crime. The appellate court concluded that the enhancements were justified and the error was harmless beyond a reasonable doubt. *Id.* at *10 -11.

A statutory sentencing scheme that allows a judge to enhance a sentence based on factual findings not found by a jury, admitted by the defendant, or reflected in the jury verdict is unconstitutional. *Blakely v. Washington*, 542 U.S. 296, 303 (2004). In *Blakely,* the Supreme Court reiterated its previous holding that "[o]ther than the fact of a prior

conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt," *Apprendi v. New Jersey,* 530 U.S. 466, 490 . . . (2000), and clarified that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." *Blakely*, 542 U.S. at 303 (emphasis in original) (citations omitted).

Although a *Blakely* error arises from the lack of a jury verdict or a defendant's admission with respect to a sentencing factor, it may be harmless error. *See Washington v. Recuenco*, 548 U.S. 212 (2006) (A *Blakely* error is subject to harmless error review). To establish whether an error at sentencing is harmless, "a court considers the entire record and decides whether it can conclude 'with fair assurance' that a reasonable jury would have found beyond a reasonable doubt that the defendant committed the acts establishing the challenged sentencing factor, or if it is in 'grave doubt' as to this question." *Connell v. Andrews*, 2009 WL 544493, 6-9 (N.D. Ohio 2009) (concluding *Blakely* error harmless as a reasonable jury would have found beyond a reasonable doubt that habeas petitioner committed the acts establishing the challenged sentencing factor);*Lyons v. Weisner*, 247 Fed.Appx. 440, 445 (4th Cir. 2007), *available at* 2007 WL 2683219 (same explanation of how to establish error at sentencing was harmless); *see also Neder v. United States*, 527 U.S. 1, 17 (1999) (concluding when a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless). This is the proper

harmless error review set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967) which the state appellate court applied when reviewing this claim. In this habeas proceeding, the Court must assess the prejudicial impact of this error under the "substantial and injurious effect" standard identified in *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993). *See Fry v. Pliler*, 551 U.S. 112, 118 (2007) (explaining that federal habeas courts are to use the "less onerous" *Brecht* harmless error standard whether or not the state court applied the harmless-beyond-a-reasonable-doubt standard under *Chapman*).

The trial court properly considered Petitioner's prior convictions to enhance his sentence. The other two sentencing enhancements used by the trial court, however, were based on judicial fact-finding, thus violating *Blakely*. The trial judge was required to impose a 20 year sentence unless he found that certain facts justified imposing a higher sentence within the range. Although entitled to the presumptive 20 year sentence absent factual findings by the trial judge, Petitioner was sentenced in excess of the presumptive minimum 20 year sentence based on his prior misdemeanor convictions and other factual findings made by the trial judge. Accordingly, Petitioner's sentence is contrary to clearly established federal law, but habeas relief is not appropriate unless this constitutional error actually harmed Petitioner. *See Washington v. Recuenco*, 548 U.S. 212, 221-22 (2006). In a habeas corpus proceeding, to determine whether a constitutional trial error is harmless, a federal court must decide whether the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

In addition to being enhanced based on the proper consideration of his prior convictions, Petitioner's sentence was enhanced by a non-jury finding that he used a deadly weapon during the commission of the crime. The evidence before the jury that Petitioner stabbed the victim at least 15 times with a knife, and the jury's verdict of guilt for second degree murder clearly demonstrates Petitioner committed the murder with a deadly weapon, i.e., a knife. *See Rameses v. Kernan*, 2010 WL 582581, *2 (9th Cir. 2010) (finding harmless error after concluding had the indictments and plea agreements from prior conviction demonstrating he committed each murder with a gun, knife, or sword been presented to the jury, it undoubtably would have concluded Rameses committed each of his prior murders with a firearm or deadly weapon). Accordingly, the use of this enhancement factor by the sentencing court was harmless.

The judge also enhanced Petitioner's sentence by a non-jury finding that Petitioner had a previous history of unwillingness to comply with conditions of a sentence involving release in the community. The presentence report and probation officer's testimony, neither of which were objected to by Petitioner during his sentencing hearing, clearly reflects Petitioner failed to comply with the conditions of a sentence involving release in the community. Therefore, had the state presented the jury with these two aggravating sentencing factors, it undoubtedly would have concluded that Petitioner committed the murder with a deadly weapon and that he failed to comply with the conditions of a sentence involving release in the community. Thus, as the state court concluded, any *Blakely* error was harmless.

The trial court enhanced Petitioner's sentence from the presumptive 20 years to the maximum 25 years based on the enhancement factors and then, after giving "little

consideration" to three mitigating factors because "[t]o some small extent, the victim initiated the argument and did things that he shouldn't have done[,]" the judge reduced the sentence to 24 years [Addendum No. 7, pp. 73-80]. In applying the harmless error standard to Petitioner's sentence the Court is not "in grave doubt about whether a trial error of federal law ha[d] substantial and injurious effect or influence" on Petitioner's sentence since the record clearly proves the enhancement factors. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). Accordingly, because Petitioner has failed to demonstrate the state court's decision was based on an unreasonable determination of facts or was contrary to or an unreasonable application of federal law, habeas relief is not warranted.

### B.    *Miranda Rights Violation*

Petitioner also contends he is entitled to habeas relief because the statements he gave to a police investigator were gained through a two-stage interrogation process which the Supreme Court of the United States has ruled renders such a confession inadmissible. *Seibert v. Missouri*, 542 U.S. 600 (2004) (*Miranda* warnings given mid-interrogation, after defendant gave unwarned confession, were ineffective, and subsequent confession was inadmissible). Petitioner contends that, as in *Siebert*, he was initially questioned without being advised of his constitutional rights as identified in *Miranda v. Arizona*, 384 U.S. 436 (1966), and it was only after making his initial confession that he was advised of his *Miranda* rights and interrogated further.

During his state post-conviction proceedings, Petitioner testified he was initially questioned without being provided *Miranda* warnings. According to Petitioner, during the initial un-*Mirandized* interview, he gave a statement admitting some involvement in the

crime.  Officers then took him to the interrogation room, gave him the *Miranda* warnings, and videotaped his statement.  Petitioner testified he subsequently gave Mr. McGinnis[3] a statement which Mr. McGinnis wrote.  When a subsequent interview was attempted, Petitioner requested an attorney, thus preventing an interview [Addendum I, Vol. 2, pp 5-16].

Investigator McGinnis testified he arrived at the murder scene around 4:24 a.m., at which time Petitioner was in the back of a patrol car.  Petitioner was then transported to the Warren County Administrative Building and arrived at approximately 4:59 a.m.  Investigator McGinnis arrived shortly thereafter.  After he conferred with another investigator and Deputy Martin, who had been at the crime scene, he took a photograph of Petitioner and his hands before taking him to the interview room where he read him his *Miranda* rights at approximately 5:42 a.m., and took a videotaped statement.  After going back to the scene and conducting a further investigation, Investigator McGinnis conducted a second interview, after again reading Petitioner his rights, at approximately 11:52 a.m.  Then Investigator McGinnis interviewed Petitioner's sister and at 5:13 p.m. Investigator McGinnis again read Petitioner his rights and attempted to question Petitioner about the discrepancies between his statement and his sister's, but Petitioner requested counsel, thus preventing the interview.  [Addendum III, Vol 2, pp. 85-92; Addendum I, Vol. 9, Exhibit 25 (waiver form)].

The state post-conviction court accredited the testimony of Investigator McGinnis as evidenced by its conclusion that Petitioner's confessions to law enforcement were not

---

[3]     Mr. McGinnis, a Warren County Criminal Investigator with the Sheriff's Department, was one of the investigators involved in this case.

coerced. The court alternatively found that even if the statements were coerced, they were intentionally allowed in by Petitioner as part of his trial strategy to support his defense of self-defense. [Addendum III, Vol. 1, pp. 35-37].

Although it does not appear that the post-conviction trial court addressed Petitioner's specific claim that he was not given his *Miranda* warnings before the first interview, the appellate court specifically addressed that claim, concluding the trial court's adjudication of the coerced confession claim was based on the court's finding that Petitioner was properly Mirandized before questioning began. The appellate court observed that "[c]learly, the post-conviction court in reaching this finding, accredited the testimony of Investigator McGinnis that the initial encounter described by the Petitioner never occurred. . . . It is not the province of this court to revisit the issue of credibility of witnesses." *Ginn v. State*, 2008 WL 2780593, *5 (Tenn.Crim.App. 2008). The appellate court also noted that Petitioner failed to establish prejudice resulted from the introduction of the statement as counsel strategically decided they wanted the statements in because they supported Petitioner's defense of self-defense. *Id.* [4]

The state court's credibility findings and findings of fact are presumed correct and Petitioner has not rebutted that presumption with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *see also Smith v. Jago*, 888 F.2d 399, 407 (6th cir. 1989) (pre-ADEPA case finding that on habeas review, credibility findings made by state appellate courts are findings of fact subject to the severely restricted review of § 2254), *cert. denied*, 495 U.S.

---

[4] During state post-conviction proceedings two of his three attorneys testified there were a lot of things in Petitioner's statement that defense counsel wanted in to establish his defense of self-defense without Petitioner having to testify. Counsel thought it was in their client's best interest to get that evidence before the jury without Petitioner having to testify [Addendum III, Vol. 2, pp. 53-77].

961 (1990). The record demonstrates that Petitioner was questioned only after he was advised of his *Miranda* rights. Specifically, the record reflects Petitioner arrived at the Warren County Administrative Building at approximately 4:59 a.m.; Investigator McGinnis arrived shortly thereafter; there were two interviews and one attempted interview; and prior to each interview Petitioner was read his rights and he and the investigator wrote their signatures, date, and time on the waiver form, each time he was read his rights [Addendum III, Vol. 2, p. 85-92; Addendum I, Vol. 9, Exhibit 25 (Waiver)]. Therefore, his statements were not taken in violation of *Miranda* or *Seibert*.

In sum, the trial judge heard all the evidence, including Petitioner's claim that he was questioned prior to receiving his *Miranda* rights, and did not find the statements to violate *Miranda* or *Seibert*. That finding is not an unreasonable determination of the facts in light of the evidence presented and is not contrary to or an unreasonable application of clearly established Supreme Court precedent, specifically, *Miranda* or *Seibert*. Accordingly, relief is not available on this claim under § 28 U.S.C. § 2254(d)(1). *See Williams v. Taylor,* 529 U.S. 362, 412 (2000).

### C.    *Ineffective Assistance of Counsel*

Petitioner claims counsel was ineffective in two respects. First, Petitioner argues that counsel failed to investigate and discover witnesses who would have testified as to the victim's propensity for violence toward Petitioner and others. Second, Petitioner contends that counsel was ineffective during the sentencing hearing. Specifically, Petitioner claims

that counsel failed to discover and prepare witnesses for the sentencing hearing, and failed to object to hearsay testimony regarding his alleged convictions and possible charges in Nevada.

### 1. Applicable Law

Petitioner charges that his attorney provided ineffective assistance at trial and at sentencing. The criteria for determining whether a Sixth Amendment claim of ineffective assistance of counsel is meritorious is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the *Strickland* test, a petitioner must show two elements: (1) that his counsel's performance was deficient, i.e., counsel was not functioning as counsel guaranteed the defendant by the Sixth Amendment, and (2) that the deficient performance resulted in prejudice to the defense, i.e., deprived the defendant of a fair trial rendering the outcome of the trial unreliable. *Id*. at 687-88; *Sims v. Livesay*, 970 F.2d 1575, 1579-81 (6th Cir. 1992).

To show deficient performance, the petitioner must demonstrate that the attorney's representation fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88; *McMann v. Richardson*, 397 U.S. 759, 771 (1970). *See also Flippins v. United States*, 808 F.2d 16, 17-18 (6th Cir.), *cert. denied*, 481 U.S. 1056 (1987). There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Sims*, 970 F.2d at 1579-80. The Court cannot indulge in hindsight, but must instead evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors. *Strickland*, 466 U.S. at 690. Trial counsel's tactical decisions are particularly difficult to

attack.  *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).

To establish the prejudice prong, petitioner must show that absent his attorney's errors, there is a reasonable probability that the result of his trial would have been different. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991). "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment." *Strickland*, 466 at 691). "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992), *cert. denied*, 508 U.S. 975 (1993).

Ineffective assistance of counsel in the context of a petition for habeas corpus review is a mixed question of law and fact.   This means that this Court will defer to the state court's findings of fact, 28 U.S.C. § 2254 (e)(1); will not defer to its legal conclusions as to *Strickland's* performance and prejudice components, since they present mixed questions of law and fact, *see Rickman v. Bell*, 131 F.3d 1150, 1153-54 (6th Cir. 1997), *cert. denied*, 523 U.S. 1133 (1998); but will bear in mind that  "a federal court may not grant a writ of habeas corpus 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather that application must also be unreasonable.'" *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 411 (2000)), *cert. denied*, 540 U.S. 1164 (2004) .

## 2. Analysis

The Court turns now to trial counsel's alleged shortcomings. Petitioner contends trial counsel rendered ineffective assistance during trial and at sentencing. The Court will address each contention as Petitioner addressed it in his petition.

### a. Failure to Investigate Victim's Propensity for Violence

Petitioner contends counsel failed to investigate the victim's criminal conduct and propensity for violence. Petitioner contends he told counsel there was a stolen truck behind the victim's trailer but counsel did not investigate, but instead "abdicat[ed] their duty to investigate to the police and district attorney's office (Court File No. 1, p. 5). Petitioner argues counsel failed to investigate the victim and present evidence of his criminal activities.

Initially, the Court observes that Petitioner has not presented any evidence demonstrating the relevance of the victim's stolen vehicle or how counsel's alleged failure to investigate the victim's truck prejudiced Petitioner. Consequently, Petitioner has not demonstrated counsel was ineffective for failing to investigate the victim's alleged stolen truck.

In support of this contention, Mr. Paul Allen Smith testified during Petitioner's state post-conviction hearing that although he testified at Petitioner's trial about the victim, he could have provided more testimony about the victim's character and his connections to the mob. For example, he could have testified the victim bragged about crimes he had committed without detection by law enforcement, like identity theft; bragged about connections he had "with criminal elements"; threats the victim had made towards Petitioner—saying Petitioner was worth more dead than alive when he owed him money, because the victim allegedly had insurance policies on Petitioner; the victim normally had

a gun on him—once representing a gun was empty and handing it off, when in fact the victim knew it still had a bullet in it;[5] the victim threatened to get Petitioner drunk and take him swimming or out on a boat when he owed him money; and that the victim was always scheming, did not care about anybody but himself, and would do whatever he needed to do or what he wanted to do.

Mr. Smith also testified he has known Petitioner since they were children; that Petitioner had never hurt anyone in the past; that he believed Petitioner was defending his life; and he would trust Petitioner with his possessions. On cross-examination, Mr. Smith admitted that Petitioner was involved in some of the schemes with the victim; that Petitioner had a prior criminal history; and Nevada had warrants out for him [Addendum III, Vol 2, pp. 32-44]

Billy George testified that he is Petitioner's step-cousin; he has know him since they were children; he was not called to testify although he was sitting in court during Petitioner's trial; that the victim came to his home three or four months before this murder looking for Petitioner and threatening to beat him; the victim told him about stealing boats and selling them in Boston; the victim constantly bragged about fighting; on two occasions the victim said he blacked Petitioner's eye because he had "smarted off to him" [Addendum No. III, pp.45-49]; and Petitioner is a good person, good hearted, very trustworthy, but let himself get pushed around at times [*Id.* at 49-53].

Petitioner had a defense team of three lawyers, two of whom testified at the state post-conviction hearing—Attorneys Scott Grissom and Dan Bryant. Counsel explained that

---

[5]    During trial Mr. Smith testified the victim normally carried a gun.

they were aware of all of the criminal activity in which the victim was involved, but they were concerned about presenting too much of that information to the jury because Petitioner was involved in that criminal activity with the victim.  Counsel concluded that almost everything they could have used against the victim would have also reflected poorly on Petitioner, as he was involved in the activity with the victim.  Specifically addressing the allegations the victim was involved with the mob in Florida, counsel testified Petitioner told counsel he was going down there and was involved in the mob business with the victim [Addendum  III, Vol. 2, pp. 61-62].

As to Petitioner's claim that Josh Thompson was not subpoenaed, Mr. Bryant testified that he believed Josh Thompson of Coffee County was supposed to come by the office for an interview and pick up a subpoena.  Counsel testified those arrangements were made after he spoke with Mr. Thompson or his mother by phone.  Counsel explained he made those arrangements with Mr. Thompson because, based on his experience, when someone comes to court voluntarily they are "less likely to waffle in their testimony and story," and counsel had experienced some difficulty in getting out-of-county service [Addendum III, Vol. 2, p. 65-66].

The post-conviction court made the following findings:

The Court does not find trial counsel's questioning or lack of questioning of Thompson, Sullivan, George, Smith, Taylor, and Breedlove to be so deficient as to deny the Defendant a fair trial.

The Court does find that a subpoena should have been issued for Josh Thompson as he initially intended to testify on behalf of the Defendant. Counsel for the Defendant had a general policy that anyone who would not voluntarily accept a subpoena nor keep his appointment would probably not make a favorable witness.  While this premise may prove to be true on many occasions, there may also be instances when a witness is shy or has some other problem preventing him for [sic] picking up his subpoena.  Better

-24-

practice would be to subpoena <u>any</u> witness to trial who potentially has favorable testimony and make every effort to confirm the witness's testimony before calling them to the stand. If they will not cooperate at that point then counsel would be justified in not calling the witness. In this hearing, Josh Thompson was not called and there is only speculation as to what he could have said at trial. Therefore, this court cannot say his testimony would likely have altered the verdict.

Paul Allen Smith was asked appropriate questions at trial by Defendant's counsel. Billy George's testimony was not necessarily needed by the Defendant and the failure to call him as a witness was not deficient. There is no substantial proof that David Sullivan would have provided substantial assistance to the Defendant at trial. He did not testify at the Post Conviction hearing and his testimony regarding Defendant and victim is speculation. Defendant's counsel made specific statements why Chris Taylor and Brent Breedlove were not questioned more as to the victim's ties to the "mob." This was a strategic decision and not deficient.

[Addendum III, Vol. 1, pp. 35-37].

The appellate court agreed that "[t]he decision made by trial counsel, with regard to whether evidence should be presented of the victim's involvement in criminal enterprises, was clearly one of trial strategy, which may not be second guessed." *Ginn v. State*, 2008 WL 2780593, *6 (Tenn.Crim.App. 2008). In addition, the court observed that counsel did present some evidence of the victims altercations with various third parties, as well as the victim's reputation for carrying a weapon. The appellate court concluded counsel's performance was not deficient nor did Petitioner suffer any prejudice, as Petitioner had failed to show how such evidence "would have aided his theory of self-defense, because the proof established that [Petitioner] returned to stab the helpless victim during a second encounter following the initial stabbing encounter." *Id.*

As to the witnesses Petitioner did not call during his state post-conviction hearing the Court observes that complaints of uncalled witnesses are not favored in federal habeas corpus review because there is only speculation as to what the uncalled witness would have

said at trial and the presentation of testimonial evidence is a matter of trial strategy. Consequently, as to the witnesses Petitioner did not call during his state post-conviction hearing, he has not demonstrated counsel's failure to call them was deficient or that he suffered any prejudice because they did not testify.

Although it might have been helpful if the victim's propensity for violence had been presented to the jury (if Petitioner had not gone back and stabbed the helpless victim to death during the second encounter), the Court observes that the testimony demonstrated that on at least one of the occasions when the victim allegedly blackened Petitioner's eye, both the victim and Petitioner had been in a fight with others, thus arguably showing Petitioner's propensity for violence. Nevertheless, as the appellate court noted, such evidence would not have aided Petitioner's theory of self-defense since after the victim initially came to his residence, the victim was retreating to his vehicle when Petitioner yelled out the door and arguably instigated the initial violent encounter. Nevertheless, even assuming the initial physical encounter was a self-defense situation, Petitioner returned to the helpless victim who was asking for help, after being told he was still alive, and stabbed him to death. Therefore, since the victim's propensity for violence would not have rendered the second encounter one of self-defense or excused Petitioner's conduct, Petitioner is unable to demonstrate counsels' performance was deficient or that he suffered any prejudice.

The record clearly supports the state courts' findings. Those courts, like this Court, determined that Petitioner had failed in each instance to show counsel performed deficiently or that he had suffered prejudice of the kind that would require a finding of ineffective assistance of counsel, under the standard set forth by the Supreme Court in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). Counsels' strategic decision not to pursue that line of questioning more in depth because they believed it would prejudice Petitioner since he was involved in the alleged criminal activity and some acts of violence with the victim, was reasonable.

Therefore, the state courts' adjudication of this claim did not result in a decision that was contrary to or an unreasonable application fo Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1). Accordingly, because trial counsels' failure to introduce the victim's propensity for violence and crime did not constitute ineffective assistance and did not prejudice Petitioner, but rather was a strategic decision on trial counsels' part, this claim warrants no habeas relief.

### b.    Failure to Prepare for Sentencing Hearing

In this claim, Petitioner also attacks counsels' failure to investigate and prepare witnesses for his sentencing hearing. Although he does not raise it in his habeas petition, in his supporting memorandum Petitioner claims counsel failed to object to hearsay testimony from the probation officer.


### I.    Witnesses

Petitioner contends trial counsel failed to prepare for the sentencing hearing. Specifically, Petitioner claims counsel failed to call Mr. Smith and Mr. George, both of whom could have testified about the victim's bad character and Petitioner's good character. In addition, Petitioner attacks counsels' decision to wait until the day of sentencing to ask his mother to testify and for presenting her testimony without any preparation.

During the post-conviction hearing, trial counsel testified he did not see the need to prepare Petitioner's mother for her testimony since Petitioner was her son and he did not believe it appropriate to tell her what to say. Counsel also testified he could not recall Petitioner requesting that any other witnesses be presented during the sentencing hearing but if he had, there was no reason not to call them as long as counsel believed they would be beneficial.

The post-conviction court made the following finding in regard to the sentencing hearing:

> Finally, counsel only called one witness to mitigation at sentencing. The Court does find that very rarely should a witness be called without a minimum of preparation as to what questions will be asked and what the likely answers would be. In this case, the mother did give helpful testimony to the Defendant so there was no harm. As to whether more witnesses should be called at sentencing, trial counsel has wide discretion. No proof was introduced at the Post Conviction hearing that indicated that any other proof would have changed the sentence as much of that proof was adduced at trial.

[Addendum III, Vol. 1, p. 37].

The appellate court concluded Petitioner failed to establish prejudice. Specifically, Petitioner failed to call his mother to testify at the post-conviction hearing, thus he failed to establish how any preparation of the witness would have benefitted him at sentencing. Second, the trial court accredited the testimony of trial counsel that Petitioner did not request additional witnesses be called to testify at his sentencing hearing. In addition, Petitioner failed to demonstrate he suffered any prejudice based on counsels' alleged shortcomings as he failed to present any proof that would have changed the outcome of the sentencing hearing. *Ginn v. State*, 2008 WL 2780593 (Tenn.Crim.App. 2008).

Considering there was no proof presented to refute that when Petitioner was told the victim was still alive that he went back to the victim, who was lying helpless on the ground suffering from several stab wounds, and  stabbed him at least two more times, the Court cannot conclude that Petitioner's sentence is unreliable because counsel failed to present good character evidence from Petitioner's proposed witnesses during sentencing.  The good-character evidence simply does not mitigate Petitioner's second attack on the victim.

Likewise, there is nothing in the record from which the Court can infer, much less conclude, that Petitioner's sentence is unreliable based on counsel's failure to prepare his mother for testifying during the sentencing hearing.  Petitioner's mother testified she failed to raise him properly; he is not a violent person; and he was protecting his grandfather and sister when he went after the victim because he thought the victim was going to burn the house after he threw the charcoal fluid in the house.  Petitioner has not shown how preparing his mother to testify would have benefitted him.  Therefore, he has failed to demonstrated that counsel's alleged deficient performance prejudiced him as there is nothing in the record which indicates Petitioner's mother could have testified about mitigating evidence that arguably could have caused the trial court to reduce his sentence to less than 24 years.

Accordingly, Petitioner is not entitled to habeas relief on this claim as he has not demonstrated that, but for trial counsel's failure to present more witnesses and prepare his mother for testifying, there is a reasonable probability that the result of his sentencing hearing would have been different, *Strickland v. Washington*, 466 U.S. at 694.

ii.     Hearsay

Finally, Petitioner complains that counsel failed to object to hearsay testimony of a probation officer who testified about his prior convictions and repeated violations of probation from the pre-sentence report. The state appellate court denied relief on this claim concluding "it is well established that reliable hearsay is admissible at a sentencing hearing if a defendant is given the opportunity to rebut the evidence. *See* T.C.A. § 40-35-209(b) (2006)." *Ginn v. State*, 2008 WL 2780593, *7 (Tenn.Crim.App.2008). Thus, the court concluded Petitioner failed to establish ineffective assistance of counsel.

"[F]ederal habeas corpus relief does not lie for errors of state law," *Estelle v. McGuire*, 502 U.S. 62, 67(1991), such as evidentiary rulings, unless the rulings "rendered the trial so fundamentally unfair" that a denial of constitutional rights results. *Webster v. Rees*, 729 F.2d 1078, 1079-80 (6th Cir.1984) (citing *Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir.1982)). The admission of evidence violates due process "[o]nly if there are no permissible inferences the jury may draw from the evidence[.]" *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir.1991). When an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process, and thus warrant habeas relief. *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir.2001) ("A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate petitioner's due process rights."); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir.2000). Nonetheless, "courts 'have defined the category of infractions that violate 'fundamental fairness' very narrowly.'" *Wright v. Dallman*, 999 F.2d 174, 178 (6th Cir.1993) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). "Generally, state-court

evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour,* 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). Thus, unless Petitioner can demonstrate that the introduction of this evidence denied him his right to a fair trial or due process, habeas relief is not warranted.

Moreover, federal habeas courts are not permitted to substitute their judgment for that of a state court on a state evidentiary ruling. It is well-settled 'that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, the Court of Appeals for the Sixth Circuit has held that federal habeas courts "'must defer to a state court's interpretation of its own rules of evidence and procedure' when assessing a habeas petition.' *Miskel v. Karnes*, 397 F.3d 446, 453 (6th Cir.2005) (quoting *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir.1988)). This is true even when the petitioner is not seeking habeas relief on the state court evidentiary determination at issue. *Adams v. Smith*, 280 F.Supp.2d 704, 721 (E.D.Mich.2003) (rejecting claim of ineffective assistance of counsel for the failure to object to hearsay based on state court's determination under state law that testimony at issue was not hearsay).

In this case, the trial court determined that reliable hearsay is admissible at a sentencing hearing if a defendant is given the opportunity to rebut the evidence. Here, Petitioner was given such an opportunity. In addition, the Court observes that there is nothing in the record to indicated any of the Probation Officer's testimony was substantially incorrect. Petitioner did not introduce any contrary evidence during his sentencing hearing or his state post-conviction hearing. Therefore, it is not the province of this Court to

substitute its judgment for that of the state trial court on this state-law evidentiary issue. Although the precise issue before the Court is whether petitioner received ineffective assistance of counsel due to the fact that counsel was failed to object to the hearsay, resolving that issue requires this Court to determine whether the proposed testimony by the Probation Officer was admissible hearsay. The record supports the conclusion of the state courts that such testimony was admissible; Petitioner has not presented any evidence that such testimony was incorrect; thus, Petitioner has not demonstrated counsel was ineffective.

Accordingly, because Petitioner has failed to demonstrate the state court's finding was based on an unreasonable determination of the facts or contrary to, or an unreasonable application of federal law, this claim fails.

## VI. CONCLUSION

Because Petitioner is not entitled to federal habeas relief, Respondent's motion for summary judgment will be **GRANTED** (Court Doc. 15) and his petition filed pursuant to 28 U.S.C. § 2254 will be **DISMISSED** (Court Doc. 1).

A separate Judgment will enter.


_____ /s/Harry S. Mattice, Jr. _____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE